735 A.2d 1129

HONORABLE JOHN A. LYNCH, JR., NEW JERSEY STATE SENA-
TOR, PLAINTIFF–APPELLANT, v. NEW JERSEY EDUCATION
ASSOCIATION, BETTY KRAEMER, KAREN JOSEPH, ED-
WARD TILLER, GERALD MATCHO, BARRY BRENDEL,
WAYNE DIBOFSKY AND BARRY BRENDEL ASSOCIATES,
DEFENDANTS–RESPONDENTS, AND NEW JERSEY EDU-
CATION ASSOCIATION UNITED STAFF ASSOCIATION, INC.,
NEW JERSEY EDUCATION ASSOCIATION PROFESSIONAL
STAFF ASSOCIATION, JOHN DOE AND RICHARD ROE, INC.,
DEFENDANTS.

Argued January 4, 1999—Decided July 27, 1999.

156

*Stephen M. Holden* and *James E. Beasley,* a member of the Pennsylvania bar argued the cause for appellant(*Beasley, Casey & Erbstein,* attorneys).

*Thomas F. Carroll, III,* argued the cause for respondents New Jersey Education Association, Betty Kraemer and Gerald Matcho (*Hill Wallack,* attorneys; *Mr. Carroll* and *Gerard H. Hanson,* on the brief).

*Mark E. Utke* argued the cause for respondent Wayne Dibofsky (*Margolis Edelstein,* attorneys).

*John L. Slimm* argued the cause for respondent Karen Joseph (*Marshall, Dennehey, Warner, Coleman & Goggin*, attorneys; *Kay E. Sickles*, on the brief).

*Vincent J. Nuzzi* argued the cause for respondents Barry Brendel and Barry Brendel Associates (*Lorber, Schneider, Nuzzi, Bilinkas & Mason*, attorneys; *Sandra A. Creighton*, on the brief).

*Thomas J. Cafferty* argued the cause for *amicus curiae*, New Jersey Press Association (*McGimpsey & Cafferty*, attorneys; *Mr. Cafferty* and *Arlene M. Turinchak*, on the brief).

*William C. Cagney*, on behalf of the respondent Edward Tiller, submitted a letter in lieu of brief relying upon the briefs submitted on behalf of the respondents New Jersey Education Association, et al. and Barry Brendel, et al. (*Lane & Mittendorf*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

Plaintiff, New Jersey State Senator John A. Lynch, Jr., claims that defendants defamed him during his successful campaign for re-election as a state senator. The Law Division denied defendants' motion for summary judgment dismissing the complaint. In an unpublished opinion, the Appellate Division reversed. We affirm in part, reverse in part, and remand to the Law Division.

## I.

The appeal arises from events surrounding the 1991 campaign for state senator from the Seventeenth District. That district includes New Brunswick and several other municipalities in Middlesex County, as well as one municipality each in Somerset and Union Counties. Senator Lynch is a prominent public official, having served as a state senator since 1981, including one term as president of the senate. He also served three terms as the Mayor of New Brunswick.

In 1991, defendant Edward Tiller, a Republican, ran against Senator Lynch, a Democrat. The remaining defendants are Till-

er's supporters or members of his campaign organization. Prominent among them is the New Jersey Education Association (NJEA or "the Association") and New Jersey Education Association Political Action Committee (NJEAPAC). Defendant Betty Kraemer was the President of the NJEA and Chairperson of NJEAPAC. Defendant Gerald Matcho was the Treasurer of the NJEAPAC fund set up for Tiller. The NJEA challenged Senator Lynch's re-election because he had been the principal sponsor of the Quality Education Act of 1990, which the NJEA opposed. According to the trial court, the NJEA was "out to get Lynch at all costs."

The involvement of the NJEA and NJEAPAC in Tiller's campaign extended beyond funding. They organized Tiller's campaign headquarters and provided him with free office equipment, lobbyists, researchers, speech-writers, and other workers. Two months before the election, some NJEA members, including defendant Wayne Dibofsky, the NJEA's Associate Director for Governmental Relations, and defendant Karen Joseph, its Associate Director for Media Relations, moved their offices to Tiller's campaign headquarters. Dibofsky, a lobbyist, and Joseph reviewed campaign literature. Joseph also wrote speeches and press releases for Tiller.

Defendant Barry Brendel, a political consultant, was hired by "Friends to Elect Ed Tiller," the Tiller campaign organization. Five years earlier, Lynch had retained Brendel, of defendant Barry Brendel Associates, as a political consultant during Lynch's 1986 New Brunswick mayoral campaign. In 1991, Brendel switched sides and drafted most of the material reviewed by Dibofsky and Joseph. Tiller gave final approval to all published material.

The 1991 campaign was marked on both sides by invective. Senator Lynch issued an advertisement depicting Tiller with a long "Pinocchio nose." The caption read "Good Guys Don't Lie." Another advertisement, claiming that Tiller had lied about his military service, asked rhetorically, "Did thousands die in Korea

so Ed Tiller could defame their honor?" Other mailers and advertisements asserted that Tiller had lied about his educational background, business and publishing experience, military record, and qualifications to be a senator.

Tiller's campaign statements were even more vituperative. In his complaint, Senator Lynch alleges that the Tiller organization's campaign materials, specifically a newspaper advertisement, a mailer, and a flier, defamed him. The advertisement was published on October 21, 1991, in *The Banner,* a free weekly New Brunswick newspaper. In relevant part, the advertisement read:

**John Lynch:**

**THE BOSS**      [photograph of Senator Lynch]

**OF BOSSES**

He's been a partner or officer in three mob-owned companies fined for illegal toxic dumping.

He's been under federal investigation for corruption in New Brunswick.

As Mayor of New Brunswick, his Law Director and Police Chief were both convicted of corruption.

He used city funds to loan money to a builder so that the builder could pay off a mortgage owed to a Lynch-owned firm.

There were 12 separate scandals during his years as Mayor.

Now his organization has been caught forging voter registration documents so he can pad his vote on Election Day.

And that's just the beginning ...

### You can tell a lot about a person by the company he keeps.

Sure a lot of people know someone who's gone bad ... but John Lynch knows nothing but bad people. Mobsters as business partners. Mobsters as clients. Major administration officials indicted and convicted one after another. And continual ethics complaints for his own shady business dealings. With this kind of company, no wonder John Lynch doesn't have time for us anymore.

The second series of statements appeared on a postcard mailer. On front and back, the mailer repeated many of the allegations of the "Boss of Bosses" advertisement. It then quoted a book by Alan A. Block and Frank R. Scarpitti, *Poisoning for Profit: The Mafia and Toxic Waste in America* 150 (1985):

Among the individuals associated with Positive Chemical and Chelsea Terminal were *John A. Lynch, Jr.,* the mayor of New Brunswick, New Jersey, and *John Albert, who had a history of arrests for organized crime matters* ... for crimes arising out of a massive organized gambling and narcotics ring.

It turned out that Albert ... and Lynch also owned the notorious toxic waste handling firm known as A to Z Chemical Company ... which was recently condemned.

Both the advertisement and the mailer were identified as having been "Paid for by Friends to Elect Ed Tiller."

The third piece, a flier, was not so identified. Defendants deny any responsibility for it. The flier's text began, "This is NO LIE: John Lynch is CONNECTED to the UNDERWORLD ..." There followed a photograph of an article from the *Home News,* a newspaper of general circulation in Middlesex County. The article, entitled "Mob Hit Suspected in DiGilio Slaying," stated that a suspect in the mob murder of John DiGilio was Louis Auricchio, a reputed member of the Genovese crime family. Paragraphs identifying Auricchio as Lynch's brother-in-law were circled. The flier concluded: "Our County & State Deserve Better than a MOB–CONNECTED POLITICIAN."

All defendants disclaimed any connection to the flier. Kraemer and Matcho denied any involvement in publishing any campaign materials. Dibofsky and Joseph admitted responsibility for editing and verifying the contents of materials. They asserted, however, that the information in the "Boss of Bosses" advertisement and the mailer came from reputable newspapers and from the book, *Poisoning for Profit.* Dibofsky and Joseph relied on the newspaper articles to support most of their accusations. Joseph also verified the information printed in *Poisoning for Profit* with one of the book's authors.

Senator Lynch insists that the "John Lynch" described in *Poisoning for Profit* is another person, John G. Lynch. *Cf.* John McLaughlin, *Teachers Could Learn a Lesson from This Lawyer,* Star–Ledger, Feb. 7, 1999, at 3 (stating that Senator Lynch is not John G. Lynch). In 1985, Senator Lynch obtained from the book's publisher a letter promising to correct any misstatements. Final-

ly, Senator Lynch contends that from Brendel's work on Lynch's previous campaign, Brendel knew that Senator Lynch was not the John G. Lynch identified in the book.

All defendants moved for summary judgment. In addition to contending that none of the statements was libelous as a matter of law, defendants also contended that Senator Lynch failed to show by clear and convincing evidence that they had published the statements with actual malice. The Law Division disagreed.

Viewing the facts in the light most favorable to Senator Lynch, the court determined that a jury could find in his favor. Specifically, the court determined that the campaign literature was "reasonably susceptible to a defamatory meaning by persons of ordinary intelligence taking the statements in context [and] considering the publications as a whole." The court further found that the case presented questions of fact and that "ample evidence" existed of defendants' malice. Consequently, the court denied the motions of Kraemer, Matcho, Joseph, Dibofsky, the NJEA, and NJEAPAC. It refused to consider as untimely motions by Tiller, Brendel, and Barry Brendel Associates.

In an unpublished opinion, the Appellate Division reversed and remanded for entry of an order granting defendants' motion for summary judgment.

Senator Lynch petitioned for certification. Although we otherwise retained jurisdiction, we remanded the matter to the Law Division for reconsideration of the motions by Tiller, Brendel, and Barry Brendel Associates. After the Law Division entered summary judgment for those defendants, we granted Senator Lynch's motion for direct certification, 154 *N.J.* 605, 713 *A.*2d 497 (1998), and his petition for certification, 156 *N.J.* 388, 718 *A.*2d 1217 (1998).

## II.

### A.

As a general rule, a statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's

reputation in the estimation of the community or to deter third persons from associating with him. *Restatement (Second) of Torts* §§ 558, 559 (1977). For the past thirty-five years, false statements about public officials have not been actionable unless published with actual malice. *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964). The same holds true for public figures. *Curtis Publ'g Co. v. Butts,* 388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed.*2d 1094 (1967). To satisfy the actual-malice standard, a plaintiff must show by clear and convincing evidence that the publisher either knew that the statement was false or published with reckless disregard for the truth. *New York Times, supra,* 376 *U.S.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706–07. To prove publication with reckless disregard for the truth, a plaintiff must show that the publisher made the statement with a "high degree of awareness of [its] probable falsity," *Garrison v. Louisiana,* 379 *U.S.* 64, 74, 85 *S.Ct.* 209, 216, 13 *L.Ed.*2d 125, 133 (1964), or with "serious doubts" as to the truth of the publication, *St. Amant v. Thompson,* 390 *U.S.* 727, 731, 88 *S.Ct.* 1323, 1325, 20 *L.Ed.*2d 262, 267 (1968). To be actionable, "the recklessness in publishing material of obviously doubtful veracity must approach the level of publishing a 'knowing, calculated falsehood.'" *Lawrence v. Bauer Publ'g & Printing Ltd.,* 89 *N.J.* 451, 466, 446 *A.*2d 469 (1982) (citation omitted). Negligent publishing does not satisfy the actual-malice test.

■ From one perspective, the actual-malice test "puts a premium on ignorance [and] encourages the irresponsible publisher not to inquire" about the truth of material. *St. Amant, supra,* 390 *U.S.* at 731, 88 *S.Ct.* at 1325, 20 *L.Ed.*2d at 267. A finding of reckless publication, however, may result if the publisher fabricates a story, publishes one that is wholly unbelievable, or relies on an informant of dubious veracity, *id.* 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 267–68; *Costello v. Ocean County Observer,* 136 *N.J.* 594, 615, 643 *A.*2d 1012 (1994), or purposely avoids the truth, *Harte–Hanks Communications, Inc. v. Connaughton,* 491

*U.S.* 657, 661 n. 2, 109 *S.Ct.* 2678, 2682 n. 2, 105 *L.Ed.*2d 562, 572 n. 2 (1989).

■ Supporting the actual-malice standard is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attack on government and public officials." *New York Times, supra,* 376 *U.S.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701. A statement made in the heat of an election contest supplies the paradigm for that commitment to free debate. "When a candidate enters the political arena, he or she 'must expect that the debate will sometimes be rough and personal.'" *Harte–Hanks, supra,* 491 *U.S.* at 687, 109 *S.Ct.* at 2695, 105 *L.Ed.*2d at 588 (quoting *Ollman v. Evans,* 750 *F.*2d 970, 1002 (D.C.Cir.1984) (en banc) (Bork, J., concurring), *cert. denied,* 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985)). Readers know that statements by one side in a political contest are often exaggerated, emotional, and even misleading. *Milkovich v. Lorain Journal Co.,* 497 *U.S.* 1, 32, 110 *S.Ct.* 2695, 2712, 111 *L.Ed.*2d 1, 26 (1990) (Brennan, J., dissenting).

■ Tempering open comment on public issues, officials, and figures is society's "pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer,* 383 *U.S.* 75, 86, 86 *S.Ct.* 669, 676, 15 *L.Ed.*2d 597, 605 (1966). Underlying that interest is "the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Id.* 383 *U.S.* at 92, 86 *S.Ct.* at 679, 15 *L.Ed.*2d at 609 (Stewart, J., concurring). Thus, the purpose of the law of defamation is to strike the right balance between protecting reputation and preserving free speech. *Ward v. Zelikovsky,* 136 *N.J.* 516, 528, 643 *A.*2d 972 (1994).

■ The existence of malice depends on publishing with knowledge that a statement is false, rather than with ill will. Spite, hostility, hatred, or the deliberate intent to harm demonstrate

possible motives for making a statement, but not publication with a reckless disregard for its truth. *Harte–Hanks, supra,* 491 *U.S.* at 666–67 & n. 7, 109 *S.Ct.* at 2685 & n. 7, 105 *L.Ed.*2d at 576 & n. 7; *Greenbelt Coop. Publ'g Ass'n v. Bresler,* 398 *U.S.* 6, 10 & n. 3, 90 *S.Ct.* 1537, 1540 & n. 3, 26 *L.Ed.*2d 6, 12 & n. 3 (1970); *Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 *N.J.* 125, 150, 516 *A.*2d 220 (1986).

Whether a statement is defamatory depends on its content, verifiability, and context. *Ward, supra,* 136 *N.J.* at 529, 643 *A.*2d 972. Evaluation of content involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it. *Ibid.* If a statement has more than a literal meaning, the critical consideration is what a reasonable reader would understand the statement to mean. *Milkovich, supra,* 497 *U.S.* at 17, 110 *S.Ct.* at 2705, 111 *L.Ed.*2d at 16–17. So viewed, insults, epithets, name-calling, and other forms of verbal abuse, although offensive, are not defamatory. *Ward, supra,* 136 *N.J.* at 529, 643 *A.*2d 972.

A statement's verifiability refers to whether it can be proved true or false. Absent a settled meaning, the truth or falsity of an insult is not susceptible to such proof. Statements calling a man a "wife-beating skunk," *Wilson v. Grant,* 297 *N.J.Super.* 128, 136–37, 687 *A.*2d 1009 (App.Div.1996), or a woman "a bitch," *Ward, supra,* 136 *N.J.* at 537, 643 *A.*2d 972, which do not have such a meaning, are not verifiable.

Statements of opinion, like unverifiable statements of fact, generally cannot be proved true or false. Opinion statements reflect a state of mind. Although they do not enjoy "a wholesale defamation exemption," *Milkovich, supra,* 497 *U.S.* at 18, 110 *S.Ct.* at 2705, 111 *L.Ed.*2d at 17; *see also Ward, supra,* 136 *N.J.* at 531, 643 *A.*2d 972, opinion statements do not trigger liability unless they imply false underlying objective facts. *Restatement (Second) of Torts, supra,* § 566. Loose, figurative or hyperbolic language is

not likely to imply specific facts, and thus is not likely to be deemed actionable. *Ward, supra,* 136 *N.J.* at 532, 643 *A.2d* 972. "The higher the 'fact content' of a statement, the more likely that the statement will be actionable." *Id.* at 531–32, 643 *A.2d* 972 (citation omitted). A pure opinion is "one that is based on stated facts or facts that are known to the parties or assumed by them to exist," *Dairy Stores, supra,* 104 *N.J.* at 147, 516 *A.2d* 220 (citations omitted); a "mixed opinion" is one "not based on facts that are stated or assumed by the parties to exist," *id.* at 147–48, 516 *A.2d* 220. *See also Restatement (Second) of Torts* § 566 comment b. If a statement could be construed as either fact or opinion, a defendant should not be held liable. An interpretation favoring a finding of "fact" would tend to "impose a chilling effect on speech." *Dairy Stores, supra,* 104 *N.J.* at 148, 516 *A.2d* 220. Political discourse depends on the expression of opinion. In an election for public office, that discourse often entails a subjective appraisal of the qualifications of a candidate. Emotion, partisanship, or self-interest, although they may impair the appraisal's value, do not justify its suppression.

The context of a statement can affect significantly its fair and natural meaning. *See Ward, supra,* 136 *N.J.* at 532, 643 *A.2d* 972; *Restatement (Second) of Torts, supra,* § 566 comment c. Context can be as varied as an ongoing hostile relationship between a radio announcer and a listener, *Wilson, supra,* 297 *N.J.Super.* at 128, 687 *A.2d* 1009, the section of a newspaper in which an article appears, *Milkovich, supra,* 497 *U.S.* at 1, 110 *S.Ct.* at 2695, 111 *L.Ed.*2d at 1, or, as here, a heated political contest.

Reinforcing the strictures of the actual-malice test is the necessity that actual malice be found by the court as a question of law. *Harte–Hanks, supra,* 491 *U.S.* at 685, 109 *S.Ct.* at 2694, 105 *L.Ed.*2d at 587; *cf. Kotlikoff v. Community News,* 89 *N.J.* 62, 67, 444 *A.2d* 1086 (1982) (whether statement is reasonably susceptible of defamatory meaning is question of law for court to determine).

As we have stated previously, "summary judgment practice is particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern." *Dairy Stores, supra,* 104 *N.J.* at 157, 516 *A.*2d 220; *see also Costello, supra,* 136 *N.J.* at 605–06, 643 *A.*2d 1012. When a case concerns a public official or public figure, the court should grant summary judgment dismissing the complaint if a reasonable jury could not find that the plaintiff had established actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby,* 477 *U.S.* 242, 255–56, 106 *S.Ct.* 2505, 2514, 91 *L.Ed.*2d 202, 216 (1986); *Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 533–34, 666 *A.*2d 146 (1995); *Costello, supra,* 136 *N.J.* at 605–06, 643 *A.*2d 1012; *Sisler v. Gannett Co.,* 104 *N.J.* 256, 279, 516 *A.*2d 1083 (1986).

This appeal focuses on whether defendants published with actual malice. A defendant in a public-figure defamation case also may seek a summary judgment without addressing that issue, if the plaintiff fails to present a *prima facie* case. Thus, the defendant is entitled to summary judgment if the plaintiff fails to prove that the defendant published the statement, that the statement is defamatory, or either that the statement is defamatory *per se* or that the plaintiff suffered special damages. *See Restatement (Second) of Torts, supra,* §§ 558, 614, 615, 616, 617, 617 comment a. Here, the parties dispute whether the statements were defamatory *per se* and whether Lynch suffered any damages. We conclude that even assuming that Senator Lynch established damages, the complaint should be dismissed as to all defendants except Brendel and Barry Brendel Associates for failure to establish publication with actual malice.

### B.

#### 1.

As a state senator and former mayor of New Brunswick, Senator Lynch was a public official and a public figure. The issue, therefore, is whether his proofs in opposition to defendants' mo-

tion for summary judgment suffice to demonstrate that defendants published defamatory statements about him with actual malice.

The most troublesome of the three pieces of campaign literature is the "Boss of Bosses" advertisement in *The Banner*. Senator Lynch alleges that the advertisement describes him not merely as associated with organized crime, but as its top official. To determine whether the statement is defamatory, we consider its content, verifiability, and context.

The term "Boss of Bosses" does not appear in standard dictionaries. To the extent that it has a literal meaning, the term means something akin to "the supervisor of supervisors." The literal meaning of the term, then, is not defamatory.

To people of ordinary intelligence, the term could have at least two other meanings. One, that of a "political boss," is not defamatory; the other, meaning "mob boss" or "Mafia don," could be defamatory. Thus, the question becomes whether the term "Boss of Bosses" fairly implies that Senator Lynch was the head of the Mafia. In concluding that the statement could not be so read, the Appellate Division reasoned that the statement was not subject to verification. Even if the statement were verifiable, we conclude that taken in context it would not be defamatory.

The alleged facts in the advertisement—that Senator Lynch has been "a partner or officer in three mob-owned companies" and has "mobsters" as "business partners" and "clients"—suggest a connection to organized crime. These "facts," however, do not support the assertion that Senator Lynch is the "boss of bosses" of the Mafia.

The "Boss of Bosses" appellation appeared in a paid advertisement during the course of a heated political campaign in which both sides engaged in mudslinging. We conclude that a reader of ordinary intelligence would not believe that Senator Lynch was the head of the leading crime family in New York. *See Mob Speak Glossary in* 1 *Random House Historical Dictionary of American Slang* 29, 29–30 (J.E. Lighter ed., 1994) ("While no one

proclaims himself the Boss of Bosses anymore, the press awards this title to whomever they feel is the boss of the strongest of the five Families of New York, who is also said to preside over *Commission* meetings."). Rather, the reader would understand the statement to be hyperbole and name-calling emanating from a rough-and-tumble political campaign.

2.

The "Boss of Bosses" advertisement also states that Senator Lynch was a "partner or officer in three mob-owned companies fined for illegal toxic dumping." Senator Lynch vigorously asserts that the statement is inaccurate. Defendants have produced no proof that Senator Lynch was in fact a partner or officer in any such company. They contend, however, that even if the statement is incorrect, they did not publish it with knowledge of its falsity or with a reckless disregard for the truth. Instead, they relied on the book, *Poisoning for Profit,* which in turn relied on the sworn testimony of a New York Assistant Attorney General. The book reported:

Among the individuals associated with Positive Chemical and Chelsea Terminal were John A. Lynch, Jr., the mayor of New Brunswick, New Jersey, and John Albert, who had a history of arrests for organized crime matters. . . .

. . . .

. . . It turned out that [John] Albert and New Brunswick's mayor, John Lynch, also owned the notorious toxic waste handling firm known as A to Z Chemical Company. Lynch was both part-owner and one of the corporation's officers.

[*Id.* at 150.]

According to the record, Senator Lynch's only association with any of the three corporations was through his role as the incorporating lawyer and initial registered agent of A to Z Chemical Company. He denies that he ever was "associated with" Positive Chemical or Chelsea Terminal and that he ever was a "part-owner and one of the [ ] officers" of A to Z Chemical Company. Consistent with Senator Lynch's denials, Edwin H. Stier, the former Director of the Division of Criminal Justice, declared, in a statement issued shortly after the publication of the advertisement and the mailer, that he knew that the "John Lynch" identified in

*Poisoning for Profit* as associated with Positive Chemical Company "is a different individual than John Lynch, the mayor of New Brunswick, and now a New Jersey State Senator." A "John G. Lynch" of Roselle, New Jersey, is listed as an incorporator of Positive Chemical Company. According to Senator Lynch, however, that person is someone else.

The essential issue is not whether another John Lynch existed. Rather, the issue is whether defendants entertained serious doubts whether Senator Lynch was the John Lynch identified with the chemical companies. Our review leads us to conclude that the evidence does not establish a jury question that defendants other than Brendel entertained such doubts.

The Senator thus contends that the book misrepresented both that he was "associated with" Positive Chemical and Chelsea Terminal and that he was a part-owner and officer of A to Z Chemical Company. Defendants compounded the inaccuracies by stating that he was a "partner and officer" in all three companies.

Additionally, Senator Lynch points out that defendants could have ascertained from the Secretary of State the true identities of the officers of the named companies. Joseph replies that she not only read the book, but verified its content with the authors.

Defendants doubtless could have been more careful. With the possible exception of Brendel, however, the evidence does not establish that they entertained serious doubts about the truth of the assertions in the advertisement. Mere failure to investigate all sources does not prove actual malice. *Costello, supra,* 136 *N.J.* at 615, 643 *A.*2d 1012; *see also Ryan v. Brooks,* 634 *F.*2d 726 (4th Cir.1980) (publishers' reliance on previously published material not reckless where there was no reason to doubt accuracy of sources used); *McQuoid v. Springfield Newspapers,* 502 *F.Supp.* 1050 (W.D.Mo.1980) (one newspaper's reliance on article previously published by another paper not proof of reckless disregard); *Schultz v. Reader's Digest Ass'n,* 468 *F.Supp.* 551 (E.D.Mich.1979) (reliance on previously published articles not

evidence of actual malice). In sum, the facts in opposition to defendants' motion for summary judgment do not establish that a jury could find, by clear-and-convincing evidence, that defendants printed the information about Lynch knowing that it was false or seriously doubting its truth.

As to Brendel and Barry Brendel Associates, the record is different. Senator Lynch avers that during his 1986 mayoral campaign, he showed Brendel, his then political consultant, a letter from the publisher of *Poisoning for Profit* acknowledging that Senator Lynch is not John G. Lynch. It follows, according to Senator Lynch, that a jury could conclude that Brendel entertained serious doubts about Senator Lynch's role in Positive Chemical Company. Initially, the Law Division, after denying the motions for summary judgment of the other defendants, declined to consider as untimely the motions of Brendel, Barry Brendel Associates, and Tiller. In reversing the judgment as to the other defendants, the Appellate Division ruled that Senator Lynch had not demonstrated that those defendants had published with actual malice any statements, including those about Senator Lynch's alleged relationship with Positive Chemical Company. Because the Law Division refused to consider Brendel's motion, the issue whether Brendel had published with actual malice was not before the Appellate Division. On remand from this Court, the Law Division, however, believed that the Appellate Division had held that the statements, including those about Senator Lynch's association with the chemical companies, were not defamatory. For that reason, the Law Division granted the motions for summary judgment of Brendel, Barry Brendel Associates, and Tiller. The net result is that neither the Law Division nor the Appellate Division ever considered whether Brendel had serious doubts about Senator Lynch being the John Lynch associated with the chemical companies. Senator Lynch testified that he had told Brendel that he was not the other John Lynch and showed him the letter from the publisher of *Poisoning for Profit.* In light of that evidence, we believe that the appropriate resolution is to

reverse the grant of summary judgment for Brendel and Barry Brendel Associates and to remand the matter to the Law Division, where those defendants may supplement the record and renew their motions for summary judgment.

### 3.

The next group of statements in the "Boss of Bosses" advertisement and mailer disparage Senator Lynch with varied accusations: "He's been under federal investigation for corruption in New Brunswick"; "As Mayor of New Brunswick, his Law Director and Police Chief were both convicted of corruption"; "He used city funds to loan money to a builder so that the builder could pay off a mortgage owed to a Lynch-owned firm"; "There were 12 separate scandals during his years as Mayor"; and "Now his organization has been caught forging voter registration documents so he can pad his vote on Election Day." Defendants Dibofsky and Joseph testified in depositions that they had confirmed the facts in those statements with newspaper articles. Their confirmation was neither meticulous nor exhaustive. Dibofsky and Joseph, however, consulted "the most obvious available sources for corroboration." *Costello, supra,* 136 *N.J.* at 615, 643 *A.*2d 1012; *see also Schwartz v. Worrall Publications, Inc.,* 258 *N.J.Super.* 493, 501, 610 *A.*2d 425 (App.Div.1992) (finding evidence of actual malice not clear and convincing although defendant had been irresponsible in publishing defamatory article). The proof does not demonstrate that a jury could find by clear and convincing evidence that defendants published the statements with actual malice. *Costello, supra,* 136 *N.J.* at 614, 643 *A.*2d 1012.

Senator Lynch argues that the statement regarding the conviction of the New Brunswick law director and police chief failed to recite that the police director, incorrectly identified in Tiller's campaign materials as police "chief," was acquitted on appeal. To that extent, the statement was incomplete and misleading. Under some circumstances, an incomplete statement can subject defendants to liability. *See Milkovich, supra,* 497 *U.S.* at

18–19, 110 *S.Ct.* at 2705–06, 111 *L.Ed.*2d at 18 (libel may consist of incorrect or incomplete facts); *Schiavone Constr. Co. v. Time, Inc.*, 847 *F.*2d 1069, 1091 (3d Cir.1988) (inclusion of material from FBI memo implicating plaintiff's firm in criminal activity and excluding exculpatory information demonstrated magazine publisher's actual malice). Here, however, the record does not establish that defendants published with actual knowledge or serious doubts about whether the police director's conviction had been reversed.

### 4.

■ The "Boss of Bosses" advertisement concludes with a paragraph captioned "You can tell a lot about a person by the company he keeps." The paragraph recites: "Sure a lot of people know someone who's gone bad … but John Lynch knows nothing but bad people"; "Mobsters as business partners. Mobsters as clients"; "Major administration officials indicted and convicted one after another"; "And continual ethics complaints for his own shady business dealings."

The statement that "John Lynch knows nothing but bad people" has no discernible content. It is mere opinion; as such, it is not actionable. *See Newman v. Delahunty*, 293 *N.J.Super.* 491, 516, 530–31, 533–34, 681 *A.*2d 671 (Law Div.1994) (finding "exaggeration, hyperbole and obvious overstatement" in campaign cartoons requiring readers' interpretation), *aff'd o.b.*, 293 *N.J.Super.* 469, 681 *A.*2d 659 (App.Div.1996).

■ When asserting that Senator Lynch had mobsters for clients and as business partners, defendants relied on the information printed in *Poisoning for Profit* and in the newspapers. Eager, thoughtless, and negligent defendants may have been, but the record does not reflect that they published with serious doubts about the truth of the statements concerning Senator Lynch.

By comparison, the statement that officials in the Lynch administration had been "indicted and convicted one after another" was

literally true. In fact, at least two officials, the Law Director and the Police Director, had been indicted and convicted.

■ Finally, the reference to "continual ethics complaints for his own shady business dealings" was based on newspaper articles published in the *Home News* and *Star–Ledger. E.g.,* Jay McDaniel, *New Brunswick Ethics Panel Drops Conflict Complaint Against Lynch,* Star–Ledger, July 20, 1990, at 29; Kathleen McDermott, *Lynch Wants Ethics Allegation Aired,* Home News, Apr. 16, 1986, at A1. Defendants' reliance on previously reported material can support a finding of negligence only; it cannot sustain a finding of actual malice.

### 5.

■ The mailer captioned "You can tell a lot about a person by the company he keeps" essentially repeats the statements from the "Boss of Bosses" advertisement. For the same reasons that we find the statements in the advertisement not to be actionable, we likewise find the statements in the mailer non-actionable.

In their depositions, Joseph and Dibofsky testified that they never believed that Senator Lynch was part of organized crime. They nonetheless published the "Boss of Bosses" advertisement and the "You can tell a lot about a person" mailer. Senator Lynch contends that their testimony establishes that they published the statements about him with actual knowledge that they were false. The statements, however, do not assert directly that the Senator was part of organized crime. Instead, they reflect either expressions of opinion or beliefs about which Joseph and Dibofsky did not have serious doubts. More responsible people may have exercised greater care in publishing. Still, the advertisement and the mailer are best viewed as irresponsible political rhetoric, rather than actionable defamation.

### 6.

■ Our analysis of the flier captioned "This IS NO LIE" stands on a different footing. In brief, the record does not

establish that defendants published the flier. Joseph testified that no one in the NJEA had been involved in its publication. Lynch's only evidence supporting NJEA involvement was his deposition that a "Pete McDonough" told him that in Plainfield, members of the NJEA were circulating the "Boss of Bosses" advertisement and the "This IS NO Lie" flier. Senator Lynch, however, has no first-hand knowledge of the distribution of the flier. The record does not contain any testimony, affidavit, or statement from McDonough, nor could Senator Lynch locate him. In brief, Senator Lynch has failed to make a *prima facie* case against defendants concerning the flier.

### III.

The publication of false statements about a public official, including those published during an election campaign, disserves both the vilified official and the public. Freedom of speech tolerates the publication of such statements to avoid stifling open debate on matters of public concern. Even so tolerant a view nonetheless recognizes some limits on that freedom. Through the heedless publication of misleading statements, defendants have trenched on those limits. Our holding should not be construed as an endorsement of either the statements or the process that produced them.

The judgment of the Appellate Division is affirmed as to all defendants except Brendel and Barry Brendel Associates. As to these two defendants, the matter is remanded to the Law Division.

*For affirmance and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.