NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2111
_____

JAMES KERRIGAN,

Appellant

v.

OTSUKA AMERICA PHARMACEUTICAL, INC.;
MARK ALTMEYER
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-cv-04346)
District Judge:  Honorable Mary A. McLaughlin
_____

Submitted Under Third Circuit LAR 34.1(a)
March 6, 2014

Before:  RENDELL, SMITH and HARDIMAN, *Circuit Judges*.

(Filed: March 18, 2014)
_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

James Kerrigan appeals the District Court's order dismissing his complaint against

his former employer, Otsuka America Pharmaceutical, Inc. (Otsuka), and its President

and Chief Executive Officer, Mark Altmeyer. For the reasons that follow, we will vacate the District Court's order with respect to Kerrigan's claim under the New Jersey Conscientious Employee Protection Act (CEPA) and affirm the order to the extent it dismisses his common-law claim for defamation.

I

Kerrigan was hired by Otsuka in January 2006 as a Senior Director of Global Marketing, and was assigned to supervise the United States marketing of Samsca, a pharmaceutical drug used to treat dilutional hyponatremia.[1]  From 2009 until his termination, Kerrigan served as Samsca's "brand lead," planning the drug's commercial launch in 2009, developing budgets and tactical plans, and overseeing "brand champions" who carried out marketing projects related to the drug.  Kerrigan worked closely with L.W., a brand champion, and S.K., a Director of Medical Affairs who worked with the commercial side of the corporation in a support function.

For the drug's launch, Otsuka conducted advertising, developed seminars, and hired speakers to promote Samsca as a treatment for hyponatremia. In 2010, as part of the promotional effort, Otsuka contracted with Premier Healthcare Source, Inc. (Premier), to prepare and send newsletters to health care providers who worked with hyponatremia. Premier issued newsletters describing Samsca that failed to provide a "fair and balanced

---

[1] Dilutional hyponatremia is a condition that involves deficient sodium content in the blood. Merriam-Webster's Medical Dictionary (Feb. 24, 2014), http://www.merriam-webster.com/medical/hyponatremia.

approach" as required by the Food and Drug Administration (FDA)—that is, indicating important limitations and side effects of the drug (the Premier incident). Kerrigan alleged that Premier's error "was discovered," and the offending material was pulled from its website. Although Kerrigan conceded that he knew about the error, he complained that Otsuka's Legal, Medical Affairs, and Compliance departments failed to report the violation to the FDA in accordance with the agency's regulations.

Kerrigan also alleged that in 2011, an article about Samsca written by the website Today's Hospitalist, which lacked proper disclosures and fair balance, "was discovered" (the Today's Hospitalist incident). The article contained information from an Otsuka-sponsored panel, but Otsuka had not formally reviewed the piece or granted permission for its publication. Kerrigan reported the infraction to Behshad Sheldon, his direct supervisor, and Bob McQuade, Otsuka's Head of Regulatory Affairs, and worked to pull the article from the Today's Hospitalist website. Otsuka reported this error to the FDA without consequence.

After the Today's Hospitalist incident, Kerrigan was concerned that Otsuka had not reported the Premier newsletters to the FDA, and "re-reported" the violation to Sheldon, McQuade, and another employee in the Regulatory Affairs department.[2] Otsuka eventually reported the Premier incident to the FDA, which asked the corporation to

---

[2] According to Kerrigan's original complaint, he reported the Premier incident in response to an internal inquiry Otsuka made into "other potential issues" after the Today's Hospitalist incident.

inform health care providers of its lack of compliance.  In the aftermath, S.K. and L.W., who were involved in both matters, resigned from Otsuka, allegedly at Altmeyer's direction.  Kerrigan also claims his insistence that the Premier incident be reported marked him for retaliation.

Because of the Premier and Today's Hospitalist incidents, Sheldon gave Kerrigan an evaluation of "meets expectations" for his performance in 2011, explaining that Kerrigan's work "overall in fact exceeds expectation" but that his performance had to be adjusted for "the compliance issues that occurred in 2010 and were dealt with in 2011." At the same time, Sheldon noted that "the promotional compliance issues with Samsca were the result of things falling through the cracks in several parts of the organization," and that it would be "unreasonable to penalize the rest of an extremely hard-working and successful team unduly."  Altmeyer and the Human Resources department further lowered Kerrigan's performance evaluation to "needs improvement" over Sheldon's objection.

In May 2011, Mark Altmeyer pressured Kerrigan to establish Drug Utilization Evaluations (DUEs) for accounts that involved Samsca, which were tests that would ensure that the drug was used appropriately. Kerrigan reported Altmeyer's request to his supervisor, as he believed his department's involvement in developing DUEs would violate FDA regulations.

According to Kerrigan, within a week of the alleged DUE violation report,

Altmeyer began an "offensive" of shaming and belittling Kerrigan in front of his colleagues. Across several team meetings, Altmeyer stated that Kerrigan did not "have any understanding of [his] business," that Kerrigan's partner did all the thinking, that he lacked "any insight and [his] strategy must be wrong," and that his "business acumen" was poor. The criticisms mounted even as the commercial team met and exceeded Samsca's annual sales goal. In another meeting, Altmeyer accused Kerrigan of "put[ting] the company at risk" with the Premier and Today's Hospitalist incidents. He reiterated this belief at another group meeting, stating: "You continually put the company at risk and don't take compliance seriously. Every time there is a problem, it is with you and your team." In May 2012, Altmeyer "uninvited" Kerrigan from an off-site companywide conference held for all brand managers and senior executives.

Altmeyer's behavior allegedly did not escape notice: senior management at Otsuka complained to Human Resources that Altmeyer was creating a hostile work environment for Kerrigan, but no investigation was undertaken. Kerrigan faults Otsuka's Human Resources department for its "failure to prevent retaliation," alleging that the department allowed Altmeyer to unilaterally lower Kerrigan's performance rating in contravention of corporate guidelines, permitted Altmeyer's continued harassment, and failed to enforce Otsuka's non-retaliation policies. Further, Kerrigan avers that his job was advertised through a "head hunter" in April 2012 while he was still employed.

Around the same time, Otsuka began investigating a January 2012 contract

between a company owned by Kerrigan's wife and Otsuka Europe, another subsidiary of Otsuka's parent corporation. Kerrigan avers that the contract did not create a conflict of interest, as it was made without his influence, was entered into by a distinct corporate entity, and would not involve his supervision. Indeed, in the ensuing investigation, Otsuka's legal department declared that Kerrigan and his team were "cleared" of any conflict. Nonetheless, on May 29, 2012, Kevin Donovan, Otsuka's Vice President of Human Resources, called Kerrigan in and terminated him "for cause" for "putting the company at risk." Despite Kerrigan's repeated inquiries, Otsuka gave no other reason for his termination.

## II

On July 11, 2012, Kerrigan filed a six-count complaint against Otsuka and Altmeyer in the Bucks County Court of Common Pleas, asserting state-law causes of action related to his employment and termination. Defendants removed the case to the District Court, and moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6).

On October 31, 2012, the District Court dismissed with prejudice Kerrigan's claims for retaliation under the New Jersey Law Against Discrimination, and his claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and misrepresentation. The District Court dismissed without prejudice Kerrigan's claims for retaliation under CEPA and for defamation.

Kerrigan filed an amended complaint on November 28, 2012, re-pleading only his

CEPA and defamation claims. Specifically, he alleged that Altmeyer harassed him because he reported compliance violations in the Premier and Today's Hospitalist incidents. He also averred that Altmeyer's derogatory comments in various team meetings, as well as Donovan's declaration that he had a conflict of interest because of his wife's contract, constituted defamatory statements. Defendants again moved to dismiss.

On March 25, 2013, the District Court granted the second motion to dismiss with prejudice. Citing *Massarano v. New Jersey Transit*, 948 A.2d 653 (N.J. Super. Ct. App. Div. 2008), the District Court held that Kerrigan did not engage in CEPA-protected whistle-blowing because his actions fell within his job responsibilities. The District Court found that Kerrigan, as the brand lead for Samsca, was responsible for ensuring compliance in the drug's marketing. It further held that Kerrigan's defamation claim failed under both Pennsylvania and New Jersey law, as Altmeyer's alleged statements were "opinions that do not imply any undisclosed false fact." Kerrigan timely appealed.[3]

---

[3] The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a). We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over the District Court's order to dismiss under Rule 12(b)(6). *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011). In doing so, we "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

## III

CEPA makes it unlawful for an employer to retaliate against an employee for reporting illegal or unethical workplace activities. To state a *prima facie* case under CEPA, an employee must demonstrate: (1) he reasonably believed that his employer's conduct violated the law; (2) he performed a "whistle-blowing" activity as defined in the statute; (3) he suffered an adverse employment action; and (4) a causal connection existed between his whistle-blowing and his employer's retaliation. *Caver v. City of Trenton*, 420 F.3d 243, 254 (3d Cir. 2005) (citing *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003)).

The District Court held that Kerrigan had not adequately established the second prong: he had not engaged in "whistle-blowing" under CEPA because his reports of the Premier and Today's Hospitalist incidents were part of his job duties as the brand lead for Samsca. That decision relied on *Massarano v. New Jersey Transit*, 948 A.2d 653 (N.J. Super. Ct. App. Div. 2008), which had been interpreted by several New Jersey appellate decisions as creating a "job duty" exception to CEPA. These cases held that CEPA does not protect disclosures that are a regular part of the employee's job responsibilities. *See, e.g.*, *Gallo v. City of Atl. City*, No. L–5120–09, 2013 WL 2319425, *4 (N.J. Super. Ct. App. Div. May 29, 2013) (because the plaintiff's "revelations and objections were a regular part of her supervisory job responsibilities . . . [her] actions cannot constitute whistleblowing under the CEPA"); *Tayoun v. Mooney*, No. L–1897–07, 2012 WL

5273855, *5–7 (N.J. Super. Ct. App. Div. Oct. 26, 2012) ("A plaintiff who reports

conduct, as part of his or her job, is not a whistle-blower whose activity is protected under

CEPA"); *White v. Starbucks*, No. L–2422–08, 2011 WL 6111882, *9 (N.J. Super. Ct.

App. Div. Dec. 9, 2011) (plaintiff did not engage in whistle-blowing because "the issues

on which she bases her claim fall within the sphere of her job-related duties").[4]

At the time of the District Court's March 25, 2013, decision, district courts in the

Third Circuit had recognized the "job duty" exception as an established precept in New

Jersey law. *See, e.g.*, *Patterson v. Glory Foods*, Civ. No. 10–6831, 2012 WL 4504597, *8

(D.N.J. Sept. 28, 2012). After the District Court's disposition of Kerrigan's case,

however, a panel of the New Jersey Superior Court, Appellate Division, decided *Lippman*

*v. Ethicon, Inc.*, 75 A.2d 432 (N.J. Super. Ct. App. Div. Sept. 4, 2013), which expressed

skepticism of the doctrine. *Id.* at 381–82, 449. We express no opinion regarding the scope

and legitimacy of *Lippman*'s critique of *Massarano*. Nor do we opine whether *Lippman*

applies to the facts presented by Kerrigan's case. But since the District Court found the

"job duty" exception dispositive, prudence dictates that we remand Kerrigan's CEPA

---

[4] Kerrigan argues that we cannot consider unpublished opinions when applying New Jersey law, given state court rules that bar such use. While we are not bound by unpublished state court decisions, we may look to them as persuasive authority when ascertaining state law. *See Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 152 & n.6 (3d Cir. 1988) (citing an unpublished appellate decision, and noting that "the New Jersey rules are, of course, binding only on the New Jersey courts, and we would be remiss in our duty to apply New Jersey law were we to ignore a New Jersey case where the relevant issue is identical").

claim so the question of *Lippman*'s import, if any, may be considered in the first instance by the District Court.

On remand, the District Court should also consider an additional ground for Kerrigan's CEPA claim: his allegation that Altmeyer retaliated against him for reporting compliance violations related to Drug Utilization Evaluations (DUEs). In his amended complaint, Kerrigan pleaded that he refused to establish DUEs for Samsca per Altmeyer's request, and that he reported these requests because he believed the practice would have violated FDA regulations. He then alleged that "[w]ithin a week of this report . . . [Altmeyer's] offensive started." The District Court did not consider these allegations, but addressed only Kerrigan's reports of the Premier and Today's Hospitalist incidents. This is understandable, as Kerrigan did not explicitly state in his amended complaint that his DUE report merited protection under CEPA. Similarly, in his opposition to Defendants' motion to dismiss, he stated only briefly that his DUE report constituted "whistle-blowing" activity, but did not argue for a causal connection between this report and his termination. Construing the amended complaint in Kerrigan's favor, as we must when reviewing a motion to dismiss, we find there is at least a possibility of sufficient facts to establish a claim under CEPA on this ground.

IV

Kerrigan also challenges the District Court's order dismissing his claim for defamation, identifying two categories of allegedly defamatory conduct. First, he

10

contends that Altmeyer subjected him to a "series of false and baseless accusations" in various team meetings, which were necessarily defamatory given Otsuka's concern that Altmeyer had created a hostile work environment. Second, he claims that Donovan, Otsuka's Vice President of Human Resources, incorrectly informed him at his termination meeting that he had a conflict of interest, which was defamatory because Kerrigan had been cleared of that accusation. We find that neither argument sustains Kerrigan's claim.

Kerrigan argues as a threshold issue that New Jersey, and not Pennsylvania, law should apply. Because this is a diversity suit, and Pennsylvania is the forum state, we apply its choice-of-law principles. *See LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996). As we have stated, "before a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law." *On Air Entm't Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000). Where there is no conflict, "the court should avoid the choice of law question." *Id.*

Here, we find no conflict between Pennsylvania and New Jersey law: both rely on the Restatement (Second) of Torts and require similar elements for defamation. *Compare MacElree v. Phila. Newspapers*, 674 A.2d 1050, 1054 (Pa. 1996) (citing Restatement definition of defamation), *with Lynch v. N.J. Educ. Ass'n*, 735 A.2d 1129, 1136 (N.J. 1999) (same). Accordingly, we need not resolve the conflict-of-law issue, and may "refer interchangeably" to Pennsylvania and New Jersey law when reviewing Kerrigan's defamation claim. *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994)

11

(applying both states' laws where there was a false conflict); *see also Lambert v. Kysar*, 983 F.2d 1110, 1114–15 (1st Cir. 1993) ("We need not resolve the [conflict-of-law] issue . . . as the outcome is the same under the substantive law of either jurisdiction.").

To state a claim for defamation, a plaintiff must plead: (1) the defamatory nature of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) the recipient's understanding of the statement's defamatory meaning; (5) the recipient's understanding that the statement applied to the plaintiff; (6) special harm to the plaintiff through the statement's publication; and (7) abuse of a conditional privilege. *See* 42 Pa. Cons. Stat. § 8343(a).

"Only statements of fact, not expressions of opinion," may be defamatory in nature. *Constantino v. Univ. of Pittsburgh*, 766 A.2d 1265, 1270 (Pa. Super. Ct. 2001); *see also Lynch*, 735 A.2d at 1137 (under New Jersey law, "opinion statements do not trigger liability unless they imply false underlying objective facts"). Whether a statement constitutes a fact or opinion is a legal question resolved by the court. *See Thomas Rockwell Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 215 (Pa. 1991); *see also Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001) (observing that the question of defamatory meaning "should ordinarily be resolved at the pleading stage"). In this inquiry, courts distinguish between "pure" expressions of opinion and "mixed" statements that involve opinion and fact. *See Braig v. Field Commc'ns*, 456 A.2d 1366, 1373 (Pa. Super. Ct. 1983) (citing Restatement (Second) of Torts § 566 (1977)). "The simple

12

expression of opinion . . . expresses a comment as to the plaintiff's conduct, qualifications or character." Restatement (Second) of Torts § 566. In contrast, the "mixed" statement "gives rise to the inference that there are *undisclosed* facts that justify the forming of the opinion expressed by the defendant." *Id.* (emphasis added).

Here, Altmeyer's various statements—that Kerrigan lacked insight, had poor business acumen, and placed the company at risk—conveyed his opinions about Kerrigan's work and competence. These criticisms arose from Altmeyer's assessment of the Premier and Today's Hospitalist incidents, which Kerrigan conceded could have been attributed, at least in part, to his team's failings. While Altmeyer's speech was adverse to Kerrigan, the law of defamation does not extend to "mere obscenities, insults, and other verbal abuse." *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 187 (3d Cir. 1999); *Ward v. Zelikovsky*, 643 A.2d 972, 978 (N.J. 1994) (noting that "name calling, epithets, and abusive language, no matter how vulgar or offensive, are not actionable") (internal quotation marks and citation omitted). As the District Court correctly found, Kerrigan's statements were expressions of opinion, and as such, cannot establish a claim for defamation.

In contrast, Donovan's comment that Kerrigan was terminated "for cause" implied the undisclosed, false fact that Kerrigan had a conflict of interest, and therefore had defamatory meaning. However, "for defamation to occur . . . the defamatory statement must be published or communicated to a third person." *Elia v. Erie Ins. Exchange*, 634

13

A.2d 657, 660 (Pa. Super. Ct. 1993); *see also Lynch*, 735 A.2d at 1135–36 (requiring publication to a third-party listener). Because Donovan made this statement in private during his termination conference with Kerrigan, the publication requirement was not satisfied.

Accordingly, we hold that Kerrigan did not state a claim for defamation under either Pennsylvania or New Jersey law.

V

For the foregoing reasons, we will affirm the District Court's order to the extent that it dismissed Kerrigan's defamation claim. We will vacate the District Court's order with respect to Kerrigan's CEPA claim and remand for further consideration consistent with this opinion.