548 S.E.2d 868

G. Robert GEORGE and G. Robert George
& Associates, Inc., Appellants,

v.

Margaret D. FABRI, Respondent.

No. 25311.

Supreme Court of South Carolina.

Heard May 8, 2001.
Decided June 25, 2001.

---

444

Charles J. Baker, III, of Buist, Moore, Smythe & McGee, P.A., of Charleston, for appellants.

Armand Derfner and D. Peters Wilborn, Jr., of Derfner & Wilborn, LLC, of Charleston, for respondent.

WALLER, Justice:

Appellants G. Robert George (George) and G. Robert George and Associates, Inc. (GRGA) appeal from the grant of summary judgment to respondent Margaret D. Fabri (Fabri). We affirm.

## FACTS

This is a defamation case. In November 1997, Fabri and George opposed each other as candidates for the James Island District 12 seat on the Charleston City Council. In the first election, Fabri won by one vote. This election was set aside due to a poll worker's error. George won the second election. The allegations of defamation relate to statements Fabri made in between the two elections.

The statements were published on Fabri's website and in campaign materials. There are three categories of statements at issue: (1) those related to Dr. Henry Jordan and the South Carolina Citizens for Life's endorsement of George; (2) those related to a potential conflict of interest George would have as a council member due to his position as district engineer of the James Island Public Service District (JIPSD); and (3) those

related to engineering contracts George and GRGA received from the JIPSD.

*Dr. Henry Jordan Statements*

South Carolina Citizens for Life is a pro-life organization, and LIFEPAC is its political action committee. In between the two November elections, LIFEPAC endorsed George in a letter addressed "Dear Pro–Life Voter." [1] Included in the printed letterhead were the names of those on the Advisory Board of South Carolina Citizens for Life. Henry Jordan, a surgeon from Anderson, was listed on the letterhead. Dr. Jordan, a member of the state Board of Education, had made state-wide news a few months before when, during a Board meeting, he advocated posting the Ten Commandments in all public schools and said "Screw the Buddhists and kill the Muslims."

On the day before the election, in response to the endorsement, Fabri posted an item on her website which stated as follows in pertinent part:

Anderson physician Dr. Henry Jordan, whose racist remarks including "Screw the Buddhists and kill the Muslims" made news around the nation earlier this year—and a group of right-wing radicals of which he is a member, this weekend endorsed GOP candidate G. Robert "Bobby" George *in a mass mailing.*

The mailing ... is the first hard evidence of George's connections to Jordan and the radical right throughout South Carolina....

It appears that in his desperation not to lose again, Mr. George has shown his true nature by asking for help from Jordan and his radical organization. We think this settles once and for all the character issues that we had raised at the beginning of the campaign, and proves that Mr. George does in fact espouse dangerously radical ideas about society and supports governmental regulation of our citizen's [sic] most intimate personal lives. Can it be that Mr. George also supports Dr. Jordan's supremacist views and his sup-

---

1. In addition to endorsing George as the "pro-life candidate" for city council, the endorsement includes statements about Fabri, for example characterizing her as "one of the most hardened pro-abortionists ever to run for public office."

port for government restrictions on religious freedoms? We believe it is now clear that George would be a danger to the community, and all the residents of the City of Charleston, if he were ever elected to city council.

We believe that Mr. George and his handlers have raised these issues about "reproductive rights" and Christian superiority as a diversion from the real legitimate issues of the campaign. . . .

George alleged in his complaint that these statements implied that he is racist and holds supremacist views.

Fabri testified in her deposition that after reading the endorsement letter and seeing Dr. Jordan's name on the letterhead, it was clear to her that Dr. Jordan was endorsing George. According to Fabri, Dr. Jordan's remarks about Buddhists and Muslims could be perceived as being supremacist and racist. She stated, however, that she did not know what George thought of Dr. Jordan's comments, and did not know if George is a racist. Nonetheless, in her opinion, it is reasonable to assume that a candidate who is endorsed by an organization with Dr. Jordan as a member could be considered as sharing similar beliefs as Dr. Jordan. Furthermore, Fabri testified that George must have had some input into getting and accepting the endorsement.

Steve Abrams, Fabri's public relations consultant,[2] testified that he viewed Dr. Jordan's name on the letterhead as indicative of his active involvement in the organization. Abrams stated that since Dr. Jordan's remarks were about Buddhists and Muslims "who probably aren't Caucasians," a racial issue could be implied. In addition, Abrams testified that candidates are never "spontaneously endorsed" but instead have to "do something" to get endorsed.[3] He further stated that the intention of the statement was to show that George essentially accepted an endorsement from Dr. Jordan and that this was representative of George's "true nature."

---

2. Abrams created the website material, but Fabri reviewed and approved all material put on her website.

3. Indeed, George filled out a survey for South Carolina Citizens for Life indicating his views on abortion. The fax cover sheet to this "voter information questionnaire" contained the letterhead with Dr. Jordan's name on it.

*Conflict of Interest Statements*

Fabri made statements related to George's position as district engineer of the JIPSD and the fact that a seat on city council would result in a conflict of interest for him:

Candidate G. Robert George is a paid engineering consultant to the James Island PSD. Since the City of Charleston CPW and the James Island PSD have overlapping jurisdictions that have resulted in nasty legal battles, and since the CPW is answerable to the city council, Mr. George will have a conflict of interest should he be elected to city council and retain his PSD contracts. We think Mr. George owes the voters an explanation of what actions he will take to avoid a conflict, such as stepping down as a consultant to the PSD....

In addition, Fabri published the following statement on her website:

In an attempt to disclose the details of Mr. George's involvement with the PSD, we submitted a freedom of information request to the PSD.... We asked to see all contracts and a list of payments made to Mr. George and his company....

Mr. George (and his company) were paid $538,715.06 over the past 5 years

Although Mr. George now says that he will not do any further consulting with the PSD if elected, he entered into a new contract with the PSD just months ago, after he announced that he was running for council, that requires him to serve as "District Engineer" through the year 2000! We feel this is proof positive that he has an unresolvable ethical conflict....

As a city councilman, he would have a fiduciary responsibility to the citizens and taxpayers of the city which would be best served by annexing the rest of James Island and consolidating the cost of the CPW and PSD.

Anything that would dismantle the PSD would cause Mr. George to lose his $100,000 per year salary from the PSD projects (based on the last 5 years actual payments), so he's got a direct financial interest that would run contrary to his fiduciary responsibility as a councilman.

Hence, the reason he's so defensive about this matter.

Fabri testified it was her belief that since George had an economic interest in the "viability" of the JIPSD and "the stated objective of the City of Charleston was to annex [the JIPSD] out of existence," then his election to the city council could constitute a conflict of interest.

After the election, George resigned as the JIPSD's district engineer. According to George, he resigned to fulfill a campaign promise, and not because there was any ethical conflict. George and GRGA continue to perform other engineering services for the JIPSD; however, pursuant to a State Ethics Commission opinion, George does not vote on any matters that directly affect GRGA's economic interests.

*Engineering Contracts Statements*

Fabri published the following statement regarding engineering contracts George received from the JIPSD:

The Truth about Bob George....

Bob George says he's a Conservative, and he wants to protect your tax dollars ...

But in the past 5 years he has received over HALF A MILLION of YOUR TAX DOLLARS doing consulting work for the James Island Public Service District, an agency that he himself used to chair—and his father in law used to be on as well.

These contracts required *no competitive bidding,* so there was no one looking out for the James Island Taxpayers. They look like "sweetheart" insider contracts to us—nepotism at its worst. Not exactly the type of behavior you would have expected from a "Conservative" Republican.

Now he wants to be on the Charleston City Council so he can do to the City Taxpayers what he's already doing to the rest of the taxpayers on James Island ... use his inside contacts to land huge consulting contracts at taxpayer expense.

. . .

George alleged that these statements were defamatory because the consulting contracts were awarded after a "public competitive selection process and were not the result of insider dealing or nepotism."

George was an elected JIPSD commissioner from 1977 to 1980, and he had served as the chair of the JIPSD. His father-in-law, George Witham, served as a commissioner in the 1980's. He was not related to any of the commissioners who served on the JIPSD from 1992 through 1997.

Fabri testified that she had been told that George "appeared to be getting all the contracts" with the JIPSD. She stated that a JIPSD commissioner told her that in the 1980's George's father-in-law wanted the JIPSD to hire George as district engineer, and that George was upset when he was not selected. Moreover, Fabri stated that loyalty to George's father-in-law by those who had served with him on JIPSD extended to support for George. In her opinion, this was nepotism.

Regarding the statement that the contracts did not require "competitive bidding," Fabri testified she based that on conversations with two commissioners and on Abrams' conversation with Robert Behre, a newspaper reporter. Abrams testified that Behre described the position of district engineer as being a personal-service contract, and so the engineering contracts related to George's position as district engineer did not require bidding. Behre testified that in his discussion with Abrams he said engineering contracts would go through a "competitive process," but that there would not be a "bid *per se.*" Abrams also stated that he did not know if, in fact, George had received the engineering contracts based on nepotism or insider dealing.

The trial court granted summary judgment on all claims [4] based on the lack of evidence of Fabri's "actual malice" in making the statements. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Appellants raise four issues on appeal.

---

4. The claims in the complaint were defamation, trade disparagement, and intentional infliction of emotional distress. Regarding the intentional infliction of emotional distress claim, the trial court relied on *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), which held that a public figure making a claim for emotional distress due to a defamatory publication must meet the *New York Times* actual malice standard in order to recover.

## ISSUES

1. What is the appropriate standard for summary judgment on the issue of actual malice?

2. Did the trial court err in affording broad protection to Fabri's speech because it was in the context of a political election?

3. Did the trial court err in finding insufficient evidence of actual malice and granting summary judgment to Fabri?

4. Did the trial court err in applying the actual malice standard to GRGA's claims?

## 1. SUMMARY JUDGMENT STANDARD FOR ACTUAL MALICE

■ Appellants argue that the trial court erroneously applied a clear and convincing standard for summary judgment. According to appellants, it was error for the trial court to employ this "heightened" standard. We disagree.[5]

■ The constitutional guarantee of free speech requires that a public official or public figure must prove a defamatory statement was made "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710; *see also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (extending *New York Times* standard of actual malice to public figures); *Elder v. Gaffney Ledger,* 341 S.C. 108, 533 S.E.2d 899 (2000). At trial, the plaintiff must prove actual malice by clear and convincing evidence. *E.g., New York Times, supra; Elder, supra.*

---

**5.** Respondent argues that this issue is unpreserved because the trial court's order does not expressly state which standard it applied on summary judgment. Alternatively, respondent asserts that the trial court found *no* evidence of actual malice, and thus, the standard is immaterial. We disagree. First, the trial court found no evidence of actual malice *to withstand summary judgment.* Second, since an appellate court reviews the granting of summary judgment under the same standard applied by the trial court, it is necessary for this Court to establish the appropriate standard. *See Brockbank v. Best Capital Corp.,* 341 S.C. 372, 534 S.E.2d 688 (2000); *Baughman v. American Tel. and Tel. Co.,* 306 S.C. 101, 114, 410 S.E.2d 537, 545 (1991).

■ A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP (emphasis added). On summary judgment motion, a court must view the facts in the light most favorable to the non-moving party. *E.g., Koester v. Carolina Rental Ctr., Inc.,* 313 S.C. 490, 493, 443 S.E.2d 392, 394 (1994); *Baughman v. American Tel. and Tel. Co.,* 306 S.C. 101, 115, 410 S.E.2d 537, 545 (1991).

■ The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder. *Bankers Trust of South Carolina v. Benson,* 267 S.C. 152, 155, 226 S.E.2d 703, 704 (1976). In that way, "[a] motion for summary judgment is akin to a motion for a directed verdict" because "[i]n each instance, one party must lose *as a matter of law." Main v. Corley,* 281 S.C. 525, 526, 316 S.E.2d 406, 407 (1984) (emphasis added); *see also Baughman,* 306 S.C. at 115, 410 S.E.2d at 545 (standard for summary judgment "mirrors" standard for directed verdict).

■ In *McClain v. Arnold,* 275 S.C. 282, 270 S.E.2d 124 (1980), a defamation case, this Court affirmed summary judgment finding no evidence of actual malice. We stated 'in *McClain:*

> The presence or absence of actual malice is a constitutional issue and "where a publication is protected by the *New York Times* immunity rule, summary judgment, rather than trial on the merits, is a proper vehicle for affording constitutional protection in the proper case." ... Unless the trial court finds, based on pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice, it should grant summary judgment for the defendant.

*Id.* at 284, 270 S.E.2d at 125 (citations omitted). Our opinion in *McClain* did not, however, expressly state the standard by which actual malice should be assessed on summary judgment.

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court addressed this precise issue under Rule 56(c) of the federal

rules of civil procedure [6] and held that the clear and convincing evidence standard must be considered by the trial court when ruling on a summary judgment motion involving the issue of actual malice. The Supreme Court stated that the inquiry under Rule 56(c) "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. Therefore, the *Liberty Lobby* Court reasoned that "the inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252, 106 S.Ct. 2505. Specifically, the Supreme Court ruled that where the dispute concerns *New York Times* actual malice, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.* at 255–56, 106 S.Ct. 2505.

Appellants argue that *Liberty Lobby* does not apply to South Carolina because it was ruling on federal procedure, rather than a constitutional ruling. *See Moffatt v. Brown,* 751 P.2d 939 (Alaska 1988). While *Liberty Lobby* may not be binding, we find the logic of the case persuasive. Like the federal rule, South Carolina's Rule 56(c) requires that summary judgment be granted where there is no *genuine* issue of *material* fact and the moving party is entitled to judgment *as a matter of law.* In our opinion, the trial court would only be able to make this evaluation if it considered the substantive evidentiary standard applicable at a trial on the merits. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505 (the inquiry on a motion for summary judgment "necessarily implicates" the substantive evidentiary standard required at trial). As aptly stated in *Liberty Lobby:* "It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these

---

**6.** South Carolina's Rule 56(c) is identical to its federal counterpart.

standards and boundaries are in fact provided by the applicable evidentiary standards." *Id.* at 254–55, 106 S.Ct. 2505.

■ Furthermore, it is implicit in *McClain* that the appropriate inquiry at summary judgment on the issue of actual malice relates to what the plaintiff must prove at trial. *See McClain,* 275 S.C. at 284, 270 S.E.2d at 125 ("Unless the trial court finds . . . that the plaintiff *can prove* actual malice, it should grant summary judgment for the defendant") (emphasis added). Thus, we hold that the appropriate standard at the summary judgment phase on the *issue of constitutional* actual malice is the clear and convincing standard.

## 2. FIRST AMENDMENT PROTECTION OF SPEECH IN A POLITICAL ELECTION

■ Appellants argue that the trial court erred in stating that Fabri's statements were entitled to the broadest protection because the parties were in a political contest. Essentially, appellants contend that the trial court improperly gave the speech at issue "special protection." We disagree.

The considerations which led to the formulation of the *New York Times* rule "apply with special force to the case of the candidate." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 274, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). Additionally, the Supreme Court has explained that the *New York Times* rule "protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant." *Garrison v. Louisiana,* 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Indeed, "[t]here is little doubt that 'public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule.'" *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quoting *Ocala Star–Banner Co. v. Damron,* 401 U.S. 295, 300, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971)).

■ In *Harte–Hanks,* the Supreme Court further discussed the basis for the rule as follows:

As Madison observed in 1800, just nine years after ratification of the First Amendment:

> "Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 J. Elliot, Debates on the Federal Constitution 575 (1861).

> *This value must be protected with special vigilance.* When a candidate enters the political arena, he or she "must expect that the debate will sometimes be rough and personal," ... and cannot " 'cry Foul!' when an opponent or an industrious reporter attempts to demonstrate" that he or she lacks the "sterling integrity" trumpeted in campaign literature and speeches.... Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty.

*Id.* at 687, 109 S.Ct. 2678 (emphasis added; citations and footnote omitted). Nonetheless, despite the special value of political speech, the Supreme Court has stressed that defamatory political speech is not afforded absolute immunity, and instead is measured by the actual malice standard. *Id.* at 688, 109 S.Ct. 2678.

In the instant case, the trial court properly noted the context in which Fabri's statements were made—a political election. Essentially, the trial court stated that, in this context, free speech is particularly important. We find the trial court's statements are amply supported by Supreme Court precedent. *See id.; Monitor Patriot, supra; Garrison, supra.* However, the basis of the trial court's decision clearly—and correctly—rested on an application of the *New York Times* actual malice rule. Accordingly, appellants' argument that the trial court improperly gave special protection to Fabri's statements is meritless.

### 3. INSUFFICIENT EVIDENCE OF ACTUAL MALICE

Appellants argue there is ample evidence in the record of Fabri's actual malice and therefore the trial court erred in granting summary judgment. We disagree.[7]

As stated above, a public figure must show, by clear and convincing evidence, that defamatory statements were made with knowledge that they were false or with reckless disregard of whether they were false or not. *New York Times, supra; Curtis Publishing, supra; Elder, supra.* Initially, we note that "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte–Hanks,* 491 U.S. at 666, 109 S.Ct. 2678. Moreover, the reckless conduct contemplated by the *New York Times* standard "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *see also Elder,* 341 S.C. at 114, 533 S.E.2d at 902 ('reckless disregard' requires more than a departure from reasonably prudent conduct).

Instead, actual malice is governed by a *subjective* standard which tests the defendant's good faith belief in the truth of her statements. *Id.* There must be sufficient evidence to conclude either that the defendant made the statements with a "high degree of awareness of . . . probable falsity," *Garrison,* 379 U.S. at 74, 85 S.Ct. 209 or that the defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323.

The actual malice standard is premised on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes

---

7. Because summary judgment was granted solely on the issue of actual malice, we assume *arguendo* that the statements were false and defamatory. Although Fabri raises as an additional sustaining ground that her statements are not defamatory, we decline to address this argument. *See I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 526 S.E.2d 716 (2000) (an appellate court need not discuss respondent's additional sustaining grounds when its affirmance is grounded on an issue addressed by the lower court.)

unpleasantly sharp attacks on government and public officials." *New York Times,* 376 U.S. at 270, 84 S.Ct. 710. Indeed, "[a] statement made in the heat of an election contest supplies the paradigm for that commitment to free debate." *Lynch v. New Jersey Educ. Ass'n,* 161 N.J. 152, 735 A.2d 1129 (1999).[8]

*Dr. Jordan Statements*

██ Appellants argue that because Fabri testified she did not know whether George was a racist, there is proof that she entertained serious doubts about the truth of her statements. However, the mere fact that Fabri stated she did not know how George felt about Dr. Jordan's controversial comments or whether George was a racist is not evidence that she entertained "serious doubts" about the truth of the statements she made. *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323.

On the contrary, even viewing the evidence in the light most favorable to appellants, we find Fabri's testimony established the following regarding her *subjective* beliefs about the endorsement from South Carolina Citizens for Life/LIFEPAC: (1) that George had in some way requested, and subsequently, accepted the endorsement; (2) that Dr. Jordan, as a member of the advisory board of South Carolina Citizens for Life, was endorsing George; (3) that Dr. Jordan's controversial comments could be viewed as supremacist and racist; and (4) that it was reasonable to link George, as someone who was endorsed by an organization with Dr. Jordan as a member, to the remarks made by Dr. Jordan. Moreover, Fabri and Abrams both testified that they intended to link George to Dr. Jordan because his name appeared on the letterhead of the LIFEPAC endorsement letter.

We hold appellants could not show, by clear and convincing evidence, that Fabri in fact entertained serious doubts as to the truth of the statements she made regarding Dr. Jordan. *St. Amant, supra.* Indeed, the evidence leads only to one reasonable conclusion, i.e., that Fabri subjectively believed in the truth of her statements, and their implications, when she published them on her website. *Cf. Elder,* 341 S.C. at 118, 533 S.E.2d at 904 (where editor testified that he believed informa-

---

8. See also the authorities discussed in Issue 2, *supra.*

tion in statement from anonymous source could be true, the Court could not conclude he "purposefully avoided the truth" in printing statement).

Moreover, we agree with the trial court that Fabri simply utilized a common campaign practice—"linking a candidate to his supporters." *Cf. Lynch,* 735 A.2d at 1141 (where the New Jersey Supreme Court held no actual malice in the publication of a political advertisement linking incumbent state senator candidate to "mobsters" and stating "You can tell a lot about a person by the company he keeps."). In *Lynch,* the defendants relied on previously published information that the state senator candidate had mobsters for clients and business partners. The New Jersey Supreme Court affirmed summary judgment, stating as follows: "Eager, thoughtless, and negligent defendants may have been, but the record does not reflect that they published with serious doubts about the truth of the statements concerning Senator Lynch." *Id.*

Similarly, in the instant case, Fabri relied on the endorsement letter itself and on Dr. Jordan's controversial comments in making her statement about George. On the day before the second election, Fabri was doubtless "eager" to win, and possibly was thoughtless and negligent in making the statement; but, the evidence does not create a genuine issue of fact that she published the statement with serious doubts as to its truth. While we certainly do not condone candidates making accusations in a negligent manner, mere negligence is insufficient as a matter of law to prove actual malice. *See St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323 (actual malice "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing"); *Elder,* 341 S.C. at 114, 533 S.E.2d at 902 ('reckless disregard' requires more than a departure from reasonably prudent conduct).

Accordingly, we hold the trial court correctly granted summary judgment as to these statements.

*Conflict of Interest Statements*

Appellants argue that Fabri's motive, her lack of investigation of state ethics laws, and her failure to obtain information from the State Ethics Commission are all evidence

of her actual malice in accusing George of having an unresolvable conflict of interest if he was elected to the city council. We disagree.

The failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. *Elder,* 341 S.C. at 114, 533 S.E.2d at 902 (citing *St. Amant, supra* ). However, actual malice may be present where the defendant fails to investigate *and there are obvious reasons to doubt the veracity* of the statement or informant. *Id.* Furthermore, "[a]lthough it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry, courts should be careful not to place too much reliance on such factors." *Elder,* 341 S.C. at 117, 533 S.E.2d at 904 (citing *Harte–Hanks, supra* ).

In this case, Fabri's deposition testimony clearly indicates that she subjectively believed that George would have a conflict of interest if he was elected to city council. According to Fabri, because George was district engineer for the JIPSD, he had an economic interest in the viability of the JIPSD. Fabri further believed that the City of Charleston wanted to annex JIPSD "out of existence," and therefore George's interest in the JIPSD would be in conflict with the city's interest. Based on this testimony, appellants could not show, by clear and convincing evidence, that Fabri in fact entertained serious doubts as to the truth of the statement, or that she made the statement with a high degree of awareness of its probable falsity. *Garrison, supra; St. Amant, supra.*[9]

We hold the trial court properly decided that, as to these statements, there was insufficient evidence of actual malice to withstand summary judgment.

---

9. Moreover, appellants' claims regarding Fabri's lack of investigation into state ethics laws are unavailing. *See Elder, supra* (failure to investigate before publishing is generally insufficient to establish reckless disregard). Indeed, based on the State Ethics Commission opinion that George later received, if Fabri had investigated, she would have discovered that George would not have been able to vote on any matters that directly affected GRGA's economic interests. While this may have negated her claim that George's alleged conflict of interest was "unresolvable," it certainly supports that there were no *obvious* reasons for her to doubt the truth of her statements.

*Engineering Contracts Statements*

██ Appellants maintain that, because Fabri admits she did not *know* of any JIPSD commissioner who showed George favoritism, Fabri acted in reckless disregard when she made statements that George received "no-bid" contracts through nepotism and insider dealing. We disagree.

Once again, simply because Fabri admits that she does not know that George received engineering contracts based on improper influence does not create a *genuine* issue of material fact that she subjectively had serious doubts about her statements. Furthermore, her testimony belies that conclusion. Fabri believed that lingering loyalty to George's father-in-law who had previously served on the JIPSD influenced the JIPSD commissioners to support George. Additionally, Fabri recounted her sources for her statement that George was not required to "competitively bid" for the engineering contracts. Given this testimony, there is insufficient evidence that Fabri subjectively made these statements with a high degree of awareness of their probable falsity, or that she entertained serious doubts as to the truth of the publication. *Garrison, supra; St. Amant, supra.*

Appellants point out Fabri's lack of investigation into the JIPSD's method of selection of engineers, and the fact that this selection is competitive, although not in the form of competitive bidding. They contend that Fabri had "no knowledge whatsoever" about how the JIPSD made its selection, and therefore, she made her statements with actual malice.

Given that appellants' argument simply amounts to an allegation that Fabri failed to investigate, we find it unpersuasive. *St. Amant, supra* (reckless disregard is not measured by whether a reasonably prudent man would have investigated before publishing). Moreover, while appellants attempt to characterize Fabri's lack of investigation as tantamount to an avoidance of the truth, we disagree that Fabri did no investigation, or that Fabri purposely avoided the truth. *Elder, supra* (lack of investigation is probative on actual malice only if there are also obvious reasons to doubt truth of the informant). Finally, Fabri's testimony indicates she subjectively believed in her statements; therefore, she could not be said to have purposely avoided the truth. *Cf. id.* (where editor testi-

fied that he believed information in statement from anonymous source could be true, the Court could not conclude he "purposefully avoided the truth" in printing statement).

Accordingly, summary judgment was properly granted as to these statements.

### 4. APPLICATION OF ACTUAL MALICE STANDARD TO GRGA's CLAIMS

■ Appellants argue that the trial court erred in granting summary judgment as to the claims made by GRGA, George's engineering consulting firm. Appellants contend that GRGA is not a public figure and therefore, the actual malice standard was improperly applied by the trial court. We disagree.

According to George's affidavit, GRGA is a consulting engineering, planning, and surveying firm he founded in 1977. George is vice-president of the company and has always been its chief executive officer and principal engineer. Furthermore, George stated in his affidavit the following: "From the beginning of the firm until now, the reputation of GRGA for experience, ability, quality, ethics, and professionalism has been associated with my own reputation."

In addition, George's campaign materials included the following under the heading "WHO IS BOB GEORGE?":

Bob is founder and principle [sic] engineer of G. Robert George & Associates, Inc., a local consulting engineering firm celebrating its 20th year serving the low country and the southeast. He is a Registered Professional Engineer in South Carolina, North Carolina, Georgia and Florida and a member of several national, state and local engineering societies.

■ If an individual "voluntarily injects himself or is drawn into a particular public controversy," he "becomes a public figure for a limited range of issues ... and assume[s] special prominence in the resolution of public questions." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In determining whether a plaintiff is a limited-purpose public figure, the court should look "to the nature and extent of an individual's participation in the partic-

ular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. 2997.[10]

Under the circumstances of this case, GRGA was properly considered a public figure. In his campaign materials, George identified himself as the founder and principal engineer of GRGA. He stated that his own reputation is basically intertwined with GRGA's reputation for experience, ability, quality, ethics, and professionalism. We find that GRGA voluntarily injected itself into this campaign—or at the very least was fairly drawn into it—and thereby assumed the special prominence of a public figure. *See id.*

Therefore, GRGA achieved limited-purpose public figure status and its claims are subject to the *New York Times* actual malice standard. Accordingly, the trial court appropriately granted summary judgment as to GRGA's independent claims of defamation.

## CONCLUSION

In a political campaign, the guarantee of free speech must be protected with special vigilance to ensure the optimal functioning of the democratic process. *Harte–Hanks,* 491 U.S. at 687, 109 S.Ct. 2678. Therefore, speech about a public figure is properly measured against the actual malice rule which offers substantial protection to the critic of a public figure. Nonetheless, this qualified privilege ought not encourage political candidates to act irresponsibly while campaigning—even in a hotly contested race. We stress that our decision should not be taken as a signal that "All is fair" in politics.

---

10. We recognize that courts have employed various particularized tests to determine whether a corporate plaintiff in a defamation action is a public figure. *See, e.g., Blue Ridge Bank v. Veribanc, Inc.,* 866 F.2d 681 (4 th Cir.1989); *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3 rd Cir. 1980); *Jadwin v. Minneapolis Star and Tribune Co.,* 367 N.W.2d 476 (Minn.1985). However, given the purely political nature of the speech in this case, as opposed to the commercial nature of the speech involved in most cases with corporate defamation plaintiffs, we feel it is appropriate to look no further than the general test for public figure status as set forth by the Supreme Court in *Gertz.*

This was, however, a proper case for summary judgment, and the trial court correctly granted summary judgment to Fabri on all claims. Thus, the decision below is

**AFFIRMED.**

TOAL, C.J., and MOORE, BURNETT and PLEICONES, JJ., concur.