619 S.E.2d 428

**Tom ANDERSON, Respondent,**

v.

**The AUGUSTA CHRONICLE, Morris Communications, Inc., Petitioner.** `

**No. 26031.**

Supreme Court of South Carolina.

Heard Nov. 17, 2004.
Decided Aug. 22, 2005.
Rehearing Denied Sept. 21, 2005.

590

David E. Hudson, of Hull, Towill, Norman, Barrett, & Salley, of Augusta, and James M. Holly, of Hull, Norman, Barrett, & Salley of Aiken, for Petitioner.

Douglas Kosta Kotti, of Columbia, for Respondent.

Jay Bender, of Baker, Ravenel & Bender, of Columbia, for Amicus Curiae.

Chief Justice TOAL:

This is a libel case brought by a public figure against a newspaper. The trial judge granted a motion for directed verdict for Petitioner, the Augusta Chronicle (the Chronicle).[1] The court of appeals reversed. *Anderson v. Augusta Chronicle*, 355 S.C. 461, 585 S.E.2d 506 (Ct.App.2003). This Court granted the Chronicle's petition for certiorari to review that decision. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

In November 1996, Respondent Tom Anderson (Anderson) lost an election for a seat in South Carolina House District 84.

---

1. Morris Communications, the codefendant, does business as *The Augusta Chronicle.*

The following November, District 84 had a special election, and Anderson decided to run once again.[2]

In April 1997, Chad Bray (Bray), a reporter for the Chronicle, called Anderson to interview him about the prior year's campaign and election. The parties dispute what exactly Anderson said during that interview. Anderson testified that he told Bray that during his 1996 campaign he had worked in North Carolina as an appraiser for a number of insurance companies after hurricanes Fran and Bertha. Anderson also testified that he told Bray that, while in North Carolina, he worked for the National Flood Insurance Program. But according to Bray, Anderson said he was called away to the *National Guard*, not the National Flood Insurance Program.

On April 6, 1997, just days after Bray interviewed Anderson, the Chronicle published an article about Anderson being called to serve in the National Guard during the 1996 campaign. On June 3, 1997, the Chronicle published a second article in which Bray wrote that Anderson "felt cheated for being called away to the National Guard" in the middle of his campaign. Anderson testified that he was not aware that the Chronicle had printed the two articles, and had he known, he would have contacted someone at the Chronicle to notify them that they had made a mistake. Anderson first learned of the articles when he received a call from another writer for the Chronicle, John Boyette (Boyette).

Boyette called Anderson in September 1997 to ask whether Anderson was going to withdraw from the race because "it had been proven that he had not served in the National Guard." Anderson denied ever saying that he was in the National Guard. After the interview, Boyette authored and the Chronicle published an article entitled, "GOP wants Anderson Out of House Race." [3]

---

**2.** The special election was ordered as a result of redistricting.

**3.** On that same day, *The Aiken Standard*, a rival local newspaper, published an article entitled "Democrat responds to misinformation," which called the Chronicle's stories about Anderson into question. Later, *The Aiken Standard* published an editorial entitled "Slithering outside the Reaches of the Facts," which accused the Chronicle of conspiring with the Republican Party to help defeat Anderson in the special election.

In response, Anderson sent Pat Willis, an employee of the Chronicle, a number of documents[4] revealing that he had worked as an appraiser, not in the National Guard. The documents, however, did not confirm whether Anderson actually told Bray that he worked as an appraiser rather than serving in National Guard.

On October 1, 1997, five days after Anderson sent the documentation of his appraisal work and a month before the special election, the Chronicle published the following editorial entitled, "Let the Liar Run" by Phil Kent (Kent):

Clearwater Democrat Tom Anderson, running in November's court-ordered special election for South Carolina's House District 84 seat, has been exposed as a liar.

He told this newspaper he was called away to National Guard duty in the last weeks of the 1996 election, his first race against incumbent state Rep. Roland Smith, R–Langley. (Anderson lost by a decisive margin.)

It turns out, however, the state Guard has no record of Anderson ever serving—either then or any other time.

State GOP director Trey Walker, saying Anderson has dishonored himself and the National Guard, demands that the Democrat withdraw from the race. Walker's right about the dishonor, but what about the withdrawal?

If Anderson is the best the Democrats can come up with, they still have every right to run him. There's nothing in the election rules that says a political party can't nominate for public office a candidate who, in effect, lies on his resume.

We are confident that an informed electorate won't vote into office a proven prevaricator. After all, he doesn't even have the long robes of one of Al Gore's Buddhist monks to hide behind!

After Anderson read the editorial, he called Kent to request that it be retracted. Kent would not take Anderson's call, but he told his assistant to tell Anderson that if he sent the Chronicle a letter, it would be printed. Accordingly,

---

4. The documents included Anderson's work certification, phone bills, hotel invoices, bank records, and checks he had written during the time he did appraisals in North Carolina.

Anderson wrote a letter to the editor, and it was printed the next day, under the heading "Calls editorial 'sensational' accusations"; however, much of the letter was edited to exclude parts where Anderson criticized the editors.

Anderson brought the underlying action against the Chronicle for defamation. Anderson testified that, as a result of the damaging editorial, he cannot concentrate, has suffered depression, and has missed out on business opportunities, including an opportunity to head an insurance claims branch office in Aiken.

The trial judge ruled that Anderson failed to show that the editor responsible for publishing the article (Kent) knew that information in the article was false and, therefore, there was no issue of fact as to whether the editor acted with "actual malice." The court of appeals reversed, holding that the record included circumstantial evidence creating a question of fact as to whether Kent acted with "actual malice."

This Court granted certiorari on the following issue:

Did the court of appeals err in reversing the trial court's order directing a verdict in favor of the Chronicle?

## LAW/ANALYSIS

### Standard of Review

■ When reviewing an order granting a directed verdict, this Court must view the facts in the light most favorable to the nonmoving party. *Elam v. South Carolina Dep't of Transp.*, 361 S.C. 9, 27–28, 602 S.E.2d 772, 782 (2004) (citing *Strange v. South Carolina Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 445 S.E.2d 439 (1994)).

### Discussion

The Chronicle argues that the court of appeals erred in reversing the directed verdict because there is no evidence that the article was published with actual malice. We disagree.

■ In addition to the common law elements of defamation, a public official has the constitutional burden of proving that the defendant published the alleged defamatory material

with "actual malice." *New York Times v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). To prove "actual malice," the plaintiff must provide evidence that the defendant published the defamatory material (1) with the knowledge it was false or (2) with reckless disregard as to whether it was false.[5] *Id.* at 279–280, 84 S.Ct. 710; *George v. Fabri,* 345 S.C. 440, 451, 548 S.E.2d 868, 874 (2001).

■■■■ To find "actual malice," the court must use a subjective standard to test the "publisher's good faith belief of the truth of his or her statements." *Peeler v. Spartan Radiocasting, Inc.,* 324 S.C. 261, 266, 478 S.E.2d 282, 284 (1997). In addition, the plaintiff must provide evidence the defendant had a "high degree of awareness of . . . probable falsity." *Elder v. Gaffney Ledger,* 341 S.C. 108, 114, 533 S.E.2d 899, 902 (2000) (citing *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). In addition, one may recklessly disregard the falsity of alleged defamatory material by failing to investigate the truth of the material when "there are obvious reasons to doubt the veracity of the informant." *Id.* (citing *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

Anderson does not dispute that he is a public official. The parties focus their arguments on whether the Chronicle published the article with "actual malice." Accordingly, our discussion focuses on the element of "actual malice" alone.

## Reckless Disregard of the Truth

■■ The central issue of this case is whether any evidence exists tending to prove that Kent recklessly disregarded the truth when he published the article "Let the Liar Run." If such evidence exists, the question of actual malice is a question of fact for a jury. We find that the record includes

---

5. This test has been supported by virtue of the doctrine of *stare decisis* in several cases following *Sullivan: Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 325, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Pub. Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Harte–Hanks Comm. Inc. v. Connaughton,* 491 U.S. 657, 666, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Fleming v. Rose,* 350 S.C. 488, 567 S.E.2d 857 (2002); *Elder v. Gaffney Ledger,* 341 S.C. 108, 533 S.E.2d 899 (2000); *Peeler v. Spartan Radiocasting, Inc.,* 324 S.C. 261, 478 S.E.2d 282 (1997).

sufficient circumstantial evidence that Kent recklessly disregarded the truth when he published the article to place the question of actual malice before the jury.

The U.S. Supreme Court has recognized that failure to investigate, alone, is insufficient to support a finding that a defendant "recklessly disregarded" the falsity of a published article. *See New York Times*, 376 U.S. at 286–288, 84 S.Ct. 710 (holding that the actual malice standard cannot be met simply by using an objective standard to find failure to investigate). South Carolina has also declined to impose rigid investigatory duties on members of the press. This Court has held that to "establish recklessness, there must be an extreme departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers." *Peeler*, 324 S.C. at 266, 478 S.E.2d at 285. Further, this Court held that the "reckless conduct contemplated by the *New York Times* standard is not measured by whether a reasonably prudent man would have ... investigated before publishing." *George*, 345 S.C. at 456, 548 S.E.2d at 876 (internal citations and quotations omitted).

Nevertheless, the Supreme Court has recognized that a plaintiff will rarely find success in proving awareness that a statement is false "from the mouth of a defendant himself." *Herbert v. Lando*, 441 U.S. 153, 171–72, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Therefore, any direct or indirect evidence relevant to the defendant's state of mind is admissible to prove actual malice. A plaintiff may present competent circumstantial evidence of bad faith to establish actual malice despite a defendant's contention that the publication was made "with a belief the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Furthermore, a subjective awareness of probable falsity can be shown if there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

The record in this case is replete with circumstantial evidence of bad faith on the part of Kent. The record also contains reasons to doubt the accuracy of Bray's recount of the interview with Anderson. First, Anderson testified he

told John Boyette he had been in North Carolina working for various insurance companies, including National Flood. Boyette's September 18 article confirms both Anderson's denial and his contention that he had spent two months working in North Carolina for National Flood. Anderson contacted *The Chronicle* to dispute Boyette's article and was led to believe the misunderstanding would be corrected.

Second, on September 26 Anderson received a call from Pat Willis, an employee of *The Chronicle.* Anderson testified Willis specifically requested proof that he was a federally-approved insurance adjuster and that he had worked in North Carolina. Anderson faxed to Willis, among other things, a letter from the supervisor of National Flood's claims field operations and a resume he prepared and used during his campaign for House Seat 84. The information contained in Anderson's resume directly contradicted Bray's initial reports in *The Chronicle.* As recited by the Court of Appeals in its opinion, the resume noted Anderson had been 1) commended for supervising flood restoration projects in four states; 2) responsible for "approximately 200 contractors, workmen and damage assessors in efforts to house 4500 flood inundated families;" 3) a program chief in Johnstown, Pennsylvania following a destructive flood; 4) a contract coordinator in Los Angeles after mudslides in 1979; 5) a work supervisor following flooding in Winslow, Arizona; and 6) an appraiser of "property damage for various insurance companies and government agencies following hurricanes Andrew, Hugo, Alicia, Freddie, Camille, [and] Betsy. . . ."

Of particular interest is the fact that Anderson's resume specifically referred to his military service in the Korean War, but made no mention of the National Guard. Military records are public and easily verifiable. A jury could have concluded *The Chronicle* should have realized Anderson's purported statement was highly questionable, particularly in light of his advanced age.[6] These facts, known to *The Chronicle* before publication of "Let the liar run," could lead a reasonable jury to infer *The Chronicle* had "obvious reasons to doubt" Bray's recollection of his conversation with Anderson.

---

6. Anderson was sixty-seven at the time of trial.

Finally, Anderson entered into evidence an editorial published in the *Aiken Standard* on September 21, 1997. Senior Writer Carl Langley wrote:

> A year ago, and shortly before the November elections, Anderson, a semi-retired insurance claims adjuster, was asked by a group of independent insurance companies to help process claims from hurricane damage in North Carolina. A large number of the claims were made under the National Flood Insurance Program, *which Anderson referred to in his conversations with me and which he told me he gave to another reporter. (He not only furnished that information last year, but again this past June* after I asked him why he did not campaign before the 1996 election).

(emphasis added).

Anderson also introduced into evidence a clip from the *Aiken Standard* published on September 27, 1996 headlined "Candidate leaves area to help Fran victims." The article stated that Anderson had to break off his campaign to help process insurance claims resulting from Hurricane Fran's destruction in North Carolina. Based on this evidence, a jury could reasonably infer that Anderson had in fact said he was working with National Flood, not that he was serving in the National Guard.

Accordingly, we hold that circumstantial evidence exists as to whether Kent recklessly disregarded the truth, and therefore acted with actual malice, when he published the article "Let the Liar Run."

## Conclusion

For the foregoing reasons, we affirm the court of appeals' decision holding that the evidence, viewed in the light most favorable to Anderson, is sufficient to submit the question of actual malice to a jury.

MOORE, WALLER, JJ., and Acting Justice MARION D. MYERS, concur. BURNETT, J., concurring in a separate opinion.

Justice BURNETT, concurring:

I concur in the majority's opinion and result; however, I write separately to address the serious questions this case raises about the responsibilities of journalists to the public and their audiences.

Were we to hold the egregious facts of this case are insufficient to support a reasonable jury finding that Anderson has shown actual malice, we would essentially foreclose all liability for defamers against public officials.

The Chronicle discounts the evidence in arguing a failure to investigate alone, is insufficient for a finding that a defendant "recklessly disregarded" the falsity of a published article. The Chronicle ignores a line of Supreme Court jurisprudence guiding state and lower federal courts in determining what evidence is relevant to a finding of actual malice. The Supreme Court has concluded that, although a failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in an entirely different category. *See New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.E.2d 686 (1964). A reasonable jury could certainly infer that Anderson's claims of inaccuracy coupled with the circumstantial evidence outlined in the majority opinion evinces purposeful avoidance of the truth. *See Harte–Hanks*, 491 U.S. at 692–93, 109 S.Ct. at 2698, 105 L.E.2d at 562. To hold that a reasonable jury could find evidence of actual malice in this case would not impose, as the Chronicle suggests, a duty on a member of the press to avoid a colleague's word while investigating a story. To the contrary, allowing a jury to determine whether actual malice has been shown in the face of the considerable circumstantial evidence in this case, strikes a balance between protecting an individual's reputation and the First Amendment's protection of free speech.

The right of a free press is not absolute in a society that demands social responsibility and personal integrity. Freedom itself is conditional upon the recognition of a higher social duty to pursue truth and justice. A publication that systematically panders to sensationalism and degradation at the expense of the truth presents a cost too high for a free society to tolerate.

I believe freedom of the press is one of the greatest safeguards of liberty. This safeguard is grounded in democratic ideals promoting free thought and vigorous debate. When deliberate deception is elevated to perceived truth, the very values a free press seeks to preserve are compromised. In the interests of justice, we will not allow a publication to go so unchecked as to promote the tyrannical imposition of false and misleading information—the very concern our forefathers sought to eliminate in demanding the press be free. Our liberty cannot be guarded but by a free and independent press. A reckless and deceptive media poses the greatest danger to this freedom we so cherish.

For the foregoing reasons, I agree the evidence, viewed in the light most favorable to Anderson, is sufficient to submit the question of actual malice to the jury.